UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN S. CHARON,<br>    Plaintiff,<br><br>v.<br><br>MICHAEL ASTRUE, Commissioner<br>of Social Security Administration,<br>    Defendant. | )<br>)<br>)<br>)    Civil Action No. 09cv11774 -NG<br>)<br>)<br>)<br>) |

GERTNER, D.J.

**MEMORANDUM AND ORDER RE: PLAINTIFF'S MOTION
TO REVERSE THE DECISION OF THE COMMISSIONER
June 6, 2011**

**I.     INTRODUCTION**

Plaintiff Steven S. Charon ("Charon") appeals the decision of the Commissioner of Social Security ("Commissioner") to deny his applications for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits.  Charon claims disability based on persistent back pain caused by degenerative disc disease of the lumbar spine.  In his decision denying benefits to Charon, the Administrative Law Judge ("ALJ") determined that Charon had a residual functional capacity ("RFC") to perform light work with restrictions based on his impairment.  The ALJ further found that while Charon was unable to perform past relevant work, he could perform many jobs that exist in the national economy.  The ALJ's RFC determination was supported in part by the ALJ's findings that Charon was not credible and that opinion evidence submitted by Charon's treating physician, Dr. Nikolaos Michalacos, M.D. ("Dr. Michalacos"), was not entitled to significant probative weight.  Charon appeals the denial of benefits on the grounds that the ALJ erred in his adverse credibility finding and by not giving sufficient weight to the opinions of Dr. Michalacos.

I find: (1) that the ALJ's finding that Dr. Michalacos' opinions should not be afforded significant probative weight is supported by substantial evidence because the opinion evidence was inconsistent with the record; and (2) the ALJ's adverse credibility finding was based on nothing more than conclusory statements and recitation of facts, and he therefore failed to support his credibility finding with substantial evidence. I **GRANT in part and DENY in part** Plaintiff's Motion to Reverse the Decision of the Commissioner (document #13) and **DENY** Defendant's Motion to Affirm the Commissioner's Decision (document #18).

## II. BACKGROUND

### A. Charon's Disability Allegations

Charon is a 51 year-old man who has completed approximately two years of college and has most recently worked in construction and building maintenance. Administrative Record ("A.R.") at 25-26, 99, 104 (document #20). On March 23, 2004, Charon sustained a back injury during the course of his employment as a construction worker in Alaska. Id. at 104, 145, 184. Charon claims that he has been unable to work since that date because of the chronic lower back and leg pain associated with his injury. Id. at 14, 104, 154-55. Charon obtained a Worker's Compensation settlement of $14,000 as a result of his injury. Id. at 29.

Since sustaining his back injury, Charon has consistently taken medications to alleviate his pain, including Vicodin (hydrocodone) and Flexeril. Id. at 28,145, 187. Charon reported side effects, including drowsiness and dizziness. Id. at 28-29, 104, 109, 139. Charon claimed that he is unable to sleep more than four hours at a time once his pain medication wears off. Id. at 113. At the ALJ hearing, Charon further testified that he had difficulty sleeping and had not had a good night's sleep in a long time. Id. at 32. Charon testified that he took pain medication

approximately one hour before engaging in certain activities, such as grocery shopping, so that he could engage for between an hour to an hour and a half.  Id. at 34.

Charon claims that his condition has changed his life almost completely by forcing him to be sedentary.  Id. at 119. Charon reported that he would spend most typical days lying down on the couch trying to find a comfortable position for approximately six to seven hours because it was too painful to stay up for too long.  Id. at 32, 112.  Charon's other reported daily activities included spending two or three hours on his computer, cooking, doing laundry, vacuuming, and shopping for groceries, as well as sometimes shoveling snow and mowing the lawn with a "rider mower."  Id. at 25, 30.

Charon testified that on his "bad" days, which occurred perhaps a couple of times per month, it was more difficult to perform his daily activities, even with the use of pain medication. Id. at 34-35.  Charon claimed to be able to predict when he was going to have a bad day based on whether he engaged in too much activity, which included performing certain activities such as mowing the lawn or going to a concert.  Id. at 35.  Charon reported that he was irritable and short-tempered when he experienced increased back pain.  Id. at 117.  Charon said that he rarely goes to friends' houses anymore and that he wanted everyone to leave him alone when the pain was bad.  Id.

At the time of the hearing, Charon had not had back surgery and did not wear a back brace or use a cane.  Id. at 26, 33.  Charon maintained that he had not had back surgery despite recommendations to do so because there was no guarantee that surgery would make his condition better.  Id. at 33.  Charon testified that as a result of his disability, he could sit for a "couple of hours before it start[ed] getting really uncomfortable", stand for 45 minutes to an

hour, or an hour and a half if he "really push[ed] it", and walk for about half an hour. Id. at 27-28. He reported that he could safely lift about 25 pounds, and that while he may be able to lift more, he would "end up paying the price for it." Id. at 28, 104. Charon believed that if he found an employer that would accommodate his disability, he might be able to work approximately four hours a day, but not every day. Id. at 32.

### B. Medical Records and Opinions

The medical record includes records and opinions submitted by Charon, as well as assessments obtained by the Social Security Administration ("SSA"). Charon submitted medical opinions and treatment records from various treating physicians, including Dr. Upshur Spencer ("Dr. Spencer"), Dr. Edward Tarlov ("Dr. Tarlov"), Dr. Mustasim Rumi ("Dr. Rumi"), and Dr. Michalacos. See id. at 143-58, 184-229. The SSA obtained an evaluation of Charon from Dr. Stanley Leitzes ("Dr. Leitzes") and physical RFC assessments of Charon in February and April 2008. See id. at 160-64, 166-73, 176-83. In addition, a vocational expert ("VE") testified at the ALJ hearing with regard to employment positions available to Charon. Id. at 35-38.

#### 1. Charon's Treatment History

Charon's medical records show a history of persistent lower back and leg pain beginning after a work-related injury on March 24, 2004, and consistent treatment with medications, including Vicodin (hydrocodone) and Flexeril. The day after he sustained his injury, Charon was seen by Dr. Gilbert Dickie ("Dr. Dickie") at the emergency room of the Alaska Regional Hospital. Id. at 184-85. Charon reported severe pain in his back and right leg. Id. at 184. Charon's records show that he had a back injury and chronic back pain prior to his March 2004 injury that was successfully treated with physical therapy and that the March 2004 injury caused

a new condition with the associated symptoms. Id. at 148, 155, 184. Charon was discharged with a prescription for Vicodin and Flexeril and instructed not to lift more than 10 to 15 pounds. Id. at 185.

In April 2004, Charon was seen by Dr. Spencer of the Alaska Worker's Compensation Board, again for complaints of lower back and leg pain, as well as numbness and weakness. Id. at 145-46. Based on data, including x-rays, Dr. Spencer diagnosed Charon with degenerative disc disease of the lumbar spine. Id. at 146. His plan for Charon included a lumbar spine MRI to determine whether Charon had an acute disc herniation. Id. In the event that Charon did have such a herniation, Spencer suggested a treatment involving steroid use rather than a surgical procedure called a microscopic disectomy, which would be aimed at treating only the leg pain but not the chronic lower back pain. Id. Dr. Spencer noted that Charon seemed to understand that the latter procedure would be aimed only at the leg pain. Id.

Charon had an MRI on April 3, 2004. Id. at 186. Based on the MRI results, Dr. Spencer recommended that Charon get an epidural steroid injection to see if it would give him significant relief of his leg pain and thus inform the determination of whether or not surgery might be helpful. Id. at 144.

Charon subsequently moved from Alaska to New England. Id. at 30, 152. After Charon's move, in September 2004, Dr. Tarlov treated Charon at the Lahey Clinic Medical Center. Id. at 148-51. Charon had previously undergone a steroid injection in June 2004. Id. at 149. The injection relieved his pain for approximately two weeks, but the pain gradually returned back to its post-injury baseline. Id. at 149, 152. Dr. Tarlov recommended that Charon

undergo a hemilaminectomy.[1]  Id. at 150.  The risks of the operation were explained to Charon, and Charon agreed to it.  Id. at 148, 150.  While Charon never had the surgery, he discussed the possibility of surgery with another doctor in the following month.  Id. at 33, 153.

In October 2004, Charon was seen by Dr. Rumi at the New England Medical Center Department of Orthopaedics.  Id. at 152-58.  Dr. Rumi noted that Charon, six months into his course of pain, had exhausted a conservative course of therapy.  Id. at 153.  He recommended that Charon undergo more x-rays and obtain a new lumbar spine MRI, as his April 2004 MRI was now outdated.  Id. at 153, 156.  Dr. Rumi discussed surgery options with Charon and planned to discuss the timing of surgery with Charon after the new imaging studies were obtained.  Id.  New imaging studies were never obtained.  See id. at 28, 160.

### a. Dr. Michalacos' Opinions

Dr. Michalacos served as Charon's treating physician beginning in September 2004, approximately six months after Charon sustained his back injury, until at least April 14, 2009, shortly before the ALJ hearing was held.  See id. at 187-229.  Records show that Charon regularly made visits to Dr. Michalacos with complaints of back and leg pain.  Id.  Dr. Michalacos consistently prescribed Vicodin (hydrocodone) and Flexeril to treat Charon's pain.  Id.

In April 2009, Dr. Michalacos completed medical questionnaires in connection with Charon's disability claim.  Id. at 230-33.  He noted that Charon suffered from a disc herniation of the lumbar spine which significantly limited his physical ability to perform basic work activities

---

[1] The surgical removal of the lamina (the roof of the spinal canal that provides support and protection for the backside of the spinal cord) of the vertebral arch on one side (a procedure used to treat a herniation of an intervertebral disk).  See generally Taber's Online, Taber's Cyclopedic Medical Dictionary, 21st Ed., available at http://www.tabers.com (last updated June 23, 2009).

based on MRI results. Id. at 230-32. He reported moderate to severe pain in Charon's lower back, radiating to his right leg. Id. at 230. Dr. Michalocos concluded that Charon could not sustain competitive employment on a full-time, ongoing basis. Id. at 231. Dr. Michalacos further indicated that Charon's disc herniation was likely to produce "good days" and "bad days," and that, on average, Charon was likely to be absent from work more than four days per month. Id. at 232. Specifically, Dr. Michalacos asserted that Charon could sit for two hours, stand for one hour, walk for between zero and one hour, or sit and stand in combination for three hours in an 8-hour workday. Id. at 233. He also opined that Charon could lift up to five pounds frequently and between 11 and 20 pounds occasionally, perform simple grasping, reaching, pushing and pulling, and fine manipulation with his arms and hands, and occasionally bend, squat, kneel or crawl. Id.

  **2. SSA Evaluations**

   **a. Dr. Leitzes' Evaluation**

 Dr. Leitzes evaluated Charon in January 2008 for Disability Determination Services ("DDS"). Id. at 160-64. He confirmed the Charon's degenerative disc disease diagnosis, and further found mild scoliosis of the lumbar spine. Id. at 163. In his report to DDS, Dr. Leitzes noted that Charon had only had one MRI since his injury, and had not seen an orthopedist or neurosurgeon in four years. Id. at 160-61. He further noted that surgery was proposed to Charon, and that Charon opted out of the surgery for reasons that were unclear. Id. at 160. Based on his observations, such as Charon's ability to get on and off the exam table without difficulty, Dr. Leitzes concluded that Charon was a "healthy-appearing male who is not in pain." Id. at 161.

### b. RFC assessments

The SSA obtained RFC assessments in February and April 2008. Id. at 166-73, 176-83. The February 2008 assessment, carried out by Dr. Beth Schaff ("Dr. Schaff"), found that Charon's statement of function appeared credible. Id. at 167. She concluded that Charon could frequently lift 10 pounds and occasionally lift 20 pounds, as well as stand, walk, or sit for about 6 hours in an 8-hour workday. Id. Dr. Jane Matthews ("Dr. Matthews") performed the April 2008 assessment and concluded that Charon's allegations were partially credible. Id. at 178, 183. Her conclusions differed from those of Dr. Schaff in that she found that Charon could stand or walk for 3 to 4 hours in an 8-hour workday, or sit for about 6 hours in an 8-hour workday if he changed positions for 5 minutes every hour. Id. at 177.

### c. Vocational Expert Testimony

A vocational expert ("VE"), Dr. Sachs, testified at Charon's ALJ hearing. Id. at 35-38. The ALJ posed two hypotheticals to the VE. Id. at 36-37. The first hypothetical asked the VE to determine what jobs, if any, could be performed by a person with limitations such as those articulated by Charon during his testimony. Id. The VE concluded that no such work existed. Id. The second hypothetical asked the VE to determine what jobs, if any, could be performed by a person with limitations such as those contained in the physical RFC assessments from February and April 2008. Id. at 37. He determined that such a person could engage in unskilled light work, such as a hand packer, production worker, or a production inspector. Id. He also testified that such positions would allow for an absentee rate of approximately one day out of every one and a half months. Id. at 38.

### C. ALJ Decision

The ALJ evaluated Charon's claim using the five-step sequential evaluation process articulated by the SSA for determining whether an individual is disabled within the meaning of the Social Security Act. Id. at 11. The evaluation process requires the ALJ to determine whether the claimant: (1) is engaging in substantial gainful activity; (2) has a medically determinable impairment or combination of impairments that is severe; (3) has an impairment or combination of impairments that meet or are medically equal to listed impairment criteria; (4) has the RFC to perform the requirements of his past relevant work; and (5) is able to do any other work considering his RFC, age, education and work experience. 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ determined that Charon had not engaged in substantial gainful activity since March 23, 2004. A.R. at 12. At step two, he found that Charon had a severe impairment identified as degenerative disc disease of the lumbar spine, which caused significant limitations on Charon's ability to perform basic work activities. Id. At step three, the ALJ determined that Charon did not have an impairment or combination of impairments so as to meet or be medically equal to the listed impairments, particularly the listing relating to "disorders of the spine." Id.

The ALJ next determined that Charon had the RFC to perform light work. Id. at 13. Under the SSA, light work involves lifting no more than 20 pounds, with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Jobs in this category require "a good deal of walking or standing, or . . . involve[] sitting most of the time with some pushing and pulling of arm or leg controls." Id. In order to be considered capable of performing a full or wide range of light work, a person must have the ability to do substantially all of these activities. Id. Finally, a person capable of performing light work can

also do sedentary work, unless there are additional limiting factors such as inability to sit for long periods of time. Id. The ALJ found that Charon could lift 10 pounds frequently and 20 pounds occasionally, sit for at least 6 hours or stand or walk for 6 hours in an 8 hour day, required the option to stand for 5 minutes for every hour of sitting, and could only occasionally stoop, kneel, crouch, climb or crawl. A.R. at 13.

In making his RFC determination, the ALJ found that Charon's allegations with regard to the intensity, persistence and limiting effects of the symptoms caused by his medically determinable impairment were not credible to the extent that they were not consistent with the RFC assessment. Id. at 14. Specifically, the ALJ determined that Charon's medical record and treatment history did not support his complaints and allegation of disability and that Charon's activities of daily living belied the severity of the symptoms alleged. Id. at 14-16. The ALJ further found that Dr. Michalacos' opinion evidence was not entitled to significant probative weight because it was not supported by and was not consistent with Dr. Michalacos' own treatment notes or the record as a whole. Id. at 17. The ALJ afforded great weight to the RFC assessments obtained by the SSA. Id.

At step four, the ALJ determined that Charon was unable to perform any past relevant work as a construction laborer and maintenance worker because the requirements for those positions exceeded the limits of his RFC. Id. at 17. Finally, at step five of the evaluation process, the ALJ determined that jobs exist in significant numbers in the national economy that Charon could perform. Id. at 18. He based this determination on the vocational expert's testimony that, despite Charon's limitations, Charon would be able to perform the requirements

of representative light unskilled occupations, such as hand packers, production workers and production inspectors.  Id.

### D. Procedural History

Charon filed applications for SSDI and SSI benefits on August 20, 2007 claiming a disability beginning on March 23, 2004.  Id. at 81-92, 99.  His applications were initially denied on February 8, 2008, and were denied upon reconsideration on May 1, 2008.  Id. at 41-49, 51-56.  Charon requested a hearing by an ALJ on June 10, 2008, which was held on April 30, 2009.  Id. at 59, 67, 21-39.  On May 26, 2009, the ALJ issued a decision, finding that Charon was not disabled and not eligible for benefits.  Id. at 10-19.  Charon's case was selected for review by the Decision Review Board ("DRB").  Id. at 7-9.  The DRB did not complete its review of Charon's case within the designated 90-day period and the ALJ's denial of benefits became final on August 31, 2009.  Id. at 1-3.  Charon filed a timely appeal in this court on October 22, 2009.  Compl. (document #1).

## III. STANDARD OF REVIEW

Judicial review of an ALJ's decision is limited to determining whether the ALJ correctly applied the proper legal standards and whether factual determinations are supported by substantial evidence.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citing 42 U.S.C. § 405(g); Sullivan v. Hudson, 490 U.S. 877, 885 (1989); Richardson v. Perales, 402 U.S. 389, 401 (1971)).  An ALJ's findings are supported by substantial evidence if a reasonable mind might accept the relevant evidence as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (citations omitted).  While substantial evidence may arguably support competing

conclusions, an ALJ's conclusion will stand as long as it is supported by substantial evidence. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). Issues of credibility and the drawing of factual conclusions are the primary responsibility of the ALJ. Rodriguez, 647 F.2d at 222 (quoting Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)). However, an ALJ's findings should be upheld only if he supports it with substantial evidence and specific findings, thus providing an "accurate and logical bridge" from the evidence to his conclusion. Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). See also Manso-Pizarro, 76 F.3d at 16; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

## IV. ANALYSIS

Charon argues that the ALJ's RFC determination was not supported by substantial evidence for two reasons: (1) the ALJ did not give adequate weight to the opinions of Dr. Michalacos, Charon's treating physician; and (2) the ALJ erred in his credibility assessment. Pl.'s Mem. Supp. Mot. Reverse Decision of Comm'r at 6, 8 (document #14).

### A. Treating Physician's Opinions

In making his RFC determination, the ALJ found that Dr. Michalacos' opinion evidence was not entitled to significant probative weight because his assessment was not supported by and not consistent with his own treatment notes or the record as a whole. A.R. at 16-17. Charon challenges this finding, alleging that the ALJ failed to evaluate the evidence in accordance with 20 C.F.R. § 404.1527 and Social Security Ruling ("SSR") 96-2P. Pl.'s Mem. Supp. Mot. Reverse Decision of Comm'r at 7-8. Pursuant to 20 C.F.R. § 404.1527(d)(2), the SSA should generally give more weight to opinions from treating sources because they are likely to be able

to provide a detailed, longitudinal picture of the claimant's medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from other sources. 20 C.F.R. § 404.1527(d)(2). Where a treating source's opinion on the nature and severity of the claimant's impairments is medically supported and not inconsistent with other substantial evidence, it should be afforded controlling weight. Id. If a treating source's opinion is not given controlling weight, an ALJ should weigh the opinion evidence in light of a number of factors, including: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and any other relevant evidence. 20 C.F.R. § 404.1527(d)(2)-(6). An ALJ must provide good reasons in his decision for the weight that he gave to the treating source's opinion. 20 C.F.R. § 404.1527(d)(2).

In this case, Dr. Michalacos based his diagnosis of Charon's medically determined impairment on an MRI. A.R. at 232. Charon received an MRI in April 2004. Id. at 186. The record does not show evidence of Charon receiving a subsequent MRI. When Charon was last seen by Dr. Rumi in October 2004, Dr. Rumi recommended that Charon obtain new imaging studies, including an updated MRI, in order to further discuss surgery. Id. at 153. At that point, Charon was still planning on undergoing surgery. See id. Dr. Michalacos' treatment records from September 2004 through 2009 do not indicate that he recommended to Charon that he obtain new imaging studies. Id. at 188-229. So, despite Charon's imaging studies being deemed somewhat outdated by Dr. Rumi in late 2004, Dr. Michalacos made no efforts over the course of the five years during which he treated Charon to inform his medical opinions and treatment with

updated imaging studies.  See id. at 153, 188-229.  As such, Dr. Michalacos' opinions were not supported with sufficient evidence.

The ALJ so found, and as a result, did not afford Dr. Michalacos' opinion evidence controlling weight, or indeed any weight whatsoever.  See id. at 17.  An ALJ will give more weight to opinions supported by relevant evidence, particularly medical signs and laboratory findings.  20 C.F.R. § 404.1527(d)(3).

Furthermore, Dr. Michalacos reported Charon's pain as moderate to severe, and opined that Charon could sit for two hours, stand for one hour, walk for between zero to one hour, and sit or stand in combination for three hours.  A.R. at 232-33.  The ALJ noted that Dr. Michalacos' treatment records showed physical examinations that were essentially within normal limits.  Id. at 15.  In October 2004, one month after Charon began seeing Dr. Michalacos, Charon reported to Dr. Rumi that his pain was at the same level as at the time of his injury, and that he could stand for only five to ten minutes before he experienced severe pain in his back and right leg.  Id. at 152, 155.  However, Dr. Michalacos' treatment notes from September 2004, and consistently thereafter, indicate that Charon's distress level was "no acute [sic]."  Id. at 225; see also id. at 188-227.  These indications contradict Dr. Michalacos' reports of Charon's moderate to severe pain.  Id.  A reasonable factfinder could conclude that Dr. Michalacos' treatment records and the record as a whole do not support Dr. Michalacos' opinions.  Dr. Michalacos' report is also inconsistent with contemporaneous reports by doctors Charon saw during the same period.

For these reasons, the ALJ's conclusion that Dr. Michalacos' opinion evidence was not entitled to significant probative weight is supported by substantial evidence.

**B.     Credibility Determination**

In making his RFC assessment, the ALJ found that "[Charon]'s statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." Id. at 14. Charon claims that the ALJ erred in making this adverse credibility finding because he did not use the criteria outlined in SSR 96-7p and Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28-29 (1st Cir. 1986) (setting forth factors to be explored in developing evidence of claimant's pain or other symptoms where pain is a significant factor in his alleged inability to work). Pl.'s Mem. Supp. Mot. Reverse Decision of Comm'r at 8-9. The ALJ's evaluation of a claimant's symptoms follows a two step analysis. 20 C.F.R. §§ 404.1529(a), 416.929(a). First, the ALJ must determine whether there is a showing that a medically determinable impairment is present. 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, if the ALJ finds that the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, he must next evaluate the intensity and persistence of those symptoms so as to determine how they limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c), 416.929(c). Charon's challenge to the ALJ's credibility finding lies within the second prong of this analysis. See Pl.'s Mem. Supp. Mot. Reverse Decision of Comm'r at 8-9.

Since symptoms, such as pain, are subjective and difficult to quantify, symptom-related functional limitations and restrictions that a claimant reports, and that can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account in determining whether the claimant is disabled. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ should consider the following factors in his evaluation of the claimant's symptoms: the claimant's daily activities; the location, duration, frequency, and intensity of the

claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, received for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and factors concerning functional limitations and restrictions due to pain or other symptoms. Id.; SSR 96-7p; Avery, 797 F.2d at 29.

The ALJ's credibility determination "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence [he] considered in determining to disbelieve the [claimant]." Rohrberg v. Apfel, 26 F.Supp.2d 303, 309 (D. Mass. 1998) (quoting DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)); see also SSR 96-7p (requiring adjudicators to give specific reasons for the weight given to an individual's statements). His determination is entitled to substantial deference. Castro v. Barnhart, 198 F.Supp.2d 47, 52 (D. Mass 2002) (citing Becker v. Sec'y of Health & Human Servs., 895 F.2d 34, 36 (1st Cir. 1990)). Where the ALJ's credibility determination is supported by specific findings and substantial evidence, it is afforded deference because it was the ALJ who observed the claimant, evaluated his demeanor, and considered how his testimony fit in with the rest of the evidence. Frustaglia, 829 F.2d at 195. The findings, however, must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reason for that weight." Larlee v. Astrue, 694 F.Supp.2d 80, 86 (D. Mass. 2010) (quoting SSR 96-7p).

In this case, the ALJ failed to provide specific findings to support his decision to discredit Charon's statements. It is not clear from the ALJ's decision why the evidence undermined

Charon's credibility. After summarizing Charon's testimony, the ALJ made the conclusory statement that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." A.R. at 14. The ALJ proceeded to chronicle Charon's medical and treatment history. Id. at 14-16. It seems that the ALJ then rested his adverse credibility finding on the fact that Charon's activities of daily living belied the severity of the symptoms alleged. Id. at 16. The remainder of this finding reads as follows:

> For example, he testified that he prepares light meals, does laundry, vacuums, shops for groceries, does some yard work and snow shoveling, mows his lawn, goes out occasionally with relatives and friends, uses a computer for several hours each day, and goes fishing regularly. He stated in 2007 that he watched television, read a newspaper, handled his personal care and grooming without problems, cleaned, got out almost every day, drove an automobile, shopped in stores and by computer, and handled his finances . . . . There is no confirmation from medical sources of significant adverse side effects of medication.

Id.

The ALJ's conclusion is not a fair characterization of Charon's daily activities. The ALJ failed to state that Charon reported quick meals, including, for example, cereal, sandwiches, and frozen dinners, which would take less than 30 minutes to prepare. Id. at 114. Charon also reported that household chores such as cleaning, doing laundry and running the dishwasher took about ten minutes to complete, and that grocery shopping took less than 30 minutes at a time. Id. at 114-15. Charon testified that he shoveled snow with help and could not perform such a task by himself. Id. at 30. The ALJ also failed to acknowledge Charon's statements that he engaged in certain chores and activities, such as mowing the lawn, knowing that he would experience increased pain in the days following. Id. at 35. The ALJ's mischaracterization of Charon's daily

-17-

activities does not support the conclusion that Charon's reports are inconsistent with his statements regarding his symptoms. See Rohrberg, 26 F.Supp.2d at 309 ("[W]here the ALJ makes a cursory examination of the claimant's daily activities and concludes that they are inconsistent with her claims of pain, without any specific explanation or reference to supporting evidence in the record, a reviewing court is left in the dark and the RFC is cast in a pallor of doubt.").

The ALJ did not articulate an adequate reasoning for his adverse credibility determination, and I therefore must reverse the decision of the ALJ on this ground and **REMAND** for further proceedings.

## V. CONCLUSION

For the foregoing reasons, I **GRANT in Part and DENY in Part** Plaintiff's Motion to Reverse the Decision of the Commissioner **(document #13)** and **DENY** Defendant's Motion for Order Affirming Decision of the Commissioner **(document #18).**

**SO ORDERED.**

**Date: June 6, 2011**           /s/ Nancy Gertner
                      **NANCY GERTNER, U.S.D.J.**